```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3   THOMAS TURNER, an individual,      )
     on behalf of himself and others    )
 4   similarly situated,                )  Civil Action
                                        )
 5                        Plaintiffs    )  No. 20-11530-FDS
                                        )
 6   vs.                                )
                                        )
 7   LIBERTY MUTUAL RETIREMENT          )
     BENEFIT PLAN; LIBERTY MUTUAL       )
 8   MEDICAL PLAN; LIBERTY MUTUAL       )
     RETIREMENT BENEFIT PLAN            )
 9   RETIREMENT BOARD; LIBERTY          )
     MUTUAL GROUP INC., a               )
10   Massachusetts                      )
     Company; LIBERTY MUTUAL            )
11   INSURANCE COMPANY, a               )
     Massachusetts                      )
12   Company; and, DOES 1-50,           )
     Inclusive,                         )
13                        Defendants    )


14
     BEFORE:  MAGISTRATE JUDGE DONALD L. CABELL
15

16                        MOTION HEARING

17


18


19         John Joseph Moakley United States Courthouse
                        1 Courthouse Way
20                       Boston, MA 02210

21
                         October 4, 2024
22                          2:00 p.m.

23            Valerie A. O'Hara, FCRR, RPR
                    Official Court Reporter
24         John Joseph Moakley United States Courthouse
                        1 Courthouse Way
25                       Boston, MA 02210
                   E-mail: vaohara@gmail.com
```

APPEARANCES:

For The Plaintiffs:

    Winters & Associates, SARAH BALL, ATTORNEY,
8489 La Mesa Boulevard, La Mesa, California 91942;

For the Defendants:

    McDermott Will & Emery, by ANDREW C. LIAZOS, ESQ.,
and MARA THEOPHILA, ATTORNEY, 200 Clarendon Street,
Suite 5800, Boston, Massachusetts 02116;

    McDermott Will & Emery LLP, by RICHARD DIGGS, ESQ.
340 Madison Avenue, New York, New York 10173.

<u>PROCEEDINGS</u>

THE CLERK:  This is the case of Turner vs. Liberty Mutual Retirement Benefit Plan, et al., Civil Action Number 20-11530 will now be heard before this court.

Will counsel please identify themselves for the record.

MS. BALL:  Yes, Sarah Ball for the plaintiff, Mr. Turner.

THE COURT:  Good morning.  You are mooted, Mr. Liazos.

MR. LIAZOS:  Thank you, Andrew Liazos for Liberty Mutual.  Good morning.

THE COURT:  Good morning.

MR. DIGGS:  Richard Diggs for Liberty Mutual.

MS. THEOPHILA:  Mara Theophila for Liberty Mutual as well.

THE COURT:  Good morning to you as well.

Let me begin with an apology.  We had the prior session that ran over, and so I thank you guys for being on time, and I'm sorry I wasn't here for the start time, but I'm hopeful that within an hour, we can deal with the issues before the Court.

And I want to begin, I guess, Ms. Ball, by just asking you a question.  Well, let me ask a question of everyone generally.  Oftentimes it is the case from the

1    time parties have filed something with the Court to the

2    time we actually have an opportunity to meet and discuss,

3    life has continued to go on, the parties have talked some,

4    and the scope of what is before the Court may have changed

5    some.

6         So let me begin by asking, has anything changed

7    with respect to the pending motion and what we should be

8    spending our time talking about?

9         MS. BALL:  As far as plaintiff is concerned, there

10   has been no significant change, no.

11        THE COURT:  All right.  So, with that, Ms. Ball,

12   let me start with you because it seems a fair portion of

13   this and what we talk about may turn on the scope of the

14   claim that is left, and I may refer to that as the (a)(3)

15   claim, I may refer to as the breach claim, but we all know

16   what we are talking about.

17        And one of the things I did was to go back and

18   look at the complaint and just to see how it was

19   articulated there because there is this suggestion

20   throughout the papers that what you are articulating to be

21   the breach of a fiduciary duty has at times been amorphous

22   or has shifted, has changed from something that, according

23   to Liberty Mutual, was more of a -- more based sort of on a

24   combination of things, things that people were told versus

25   things that happened, extrajudicial-type statements versus

1   one more based on looking at plan language and seeing what

2   it represented and then contending that the defendants

3   acted inappositely, so I've got the complaint in front of

4   me.

5           I see paragraph 69, a sentence that appears to be

6   that, "At the time," that reads, "At the time that

7   defendants provided information to plaintiff and the class

8   regarding credit for time employed with Safeco, defendants

9   did not intend to give such credit," and it says, "They

10  never informed them of their intent not to credit plaintiff

11  for the time employed at Safeco until plaintiff sought

12  benefits."

13          And then it goes on to add a few more details, but

14  would you agree or disagree that that encompasses your

15  breach of fiduciary duty claim in this case such that the

16  discovery we talk about then might be warranted should turn

17  on whether it bears in any way on those allegations?

18          MS. BALL:  So I think it's a combination of

19  things, and let me know if this does not answer your

20  question, and I apologize if that's the case.  It's a

21  combination of things that Mr. Turner was told that

22  employees of Safeco were told in writing, orally.  It's a

23  combination of promises that were given and were expressed

24  in the merger documents, but it is also the previous SPDs,

25  the previous plans and the things that those plans

1    promised, so it's not just one of those things, it's a

2    combination of those things that combined to give

3    Mr. Turner and these employees an understanding of what

4    they would receive when they retired that then ended up

5    being not what they received.

6          THE COURT:  But to hear you say that, it's almost

7    like you're saying there may have been several pitches,

8    comments that were made in SPDs along the way, but you do

9    not have this framed as several claims, all of which or

10    each one of which amounts to a breach of a duty or a breach

11    of an agreement, and, in fact, the way it's worded, it

12    almost could be seen as speaking to a singular event where

13    you say at the time that defendants provided information

14    regarding credit for time employed with Safeco, they did

15    not intend to give such credit.

16          And it's not up to me in this setting to

17    adjudicate the scope of this claim.  I mean, that's going

18    to be for Judge Saylor if the case ever gets that far, but

19    I do have to figure out what's fair for discovery purposes,

20    especially where this is the only claim left, so for both

21    sides, I want to be fair, but I don't know that I can

22    endorse a theory that says it's many representations made

23    over the course of many years, and, as such, agree that you

24    therefore should be allowed to discover all sorts of stuff,

25    at least without not having a more certain sense of what

1    duty was breached here.

2          MS. BALL:  Well, with all due respect, your Honor,

3    that's the problem in this case is one we've been stifled

4    on discovery this whole time, but discovery we have done

5    has shown us that there was a longer history of these

6    misrepresentations than maybe we even thought in the first

7    place, and, you know, part of the reason why we've had to

8    shift to this (a)(3) claim now is because our (a)(1)(B)

9    claim was denied.

10         THE COURT:  Right.

11         MS. BALL:  Even though, we, plaintiffs, believe

12   that we have been able to bring that claim and that the

13   terms of this last SPD did allow -- did allow Mr. Turner

14   what he believed he had a right to.  We're left here now

15   saying, okay, we think looking at all of those documents

16   over time combined with the information Mr. Turner had

17   received over all of this time that the equitable solution

18   is to amend this plan to line up with this decade plus of

19   information that Mr. Turner had received.

20         Now, is that a long time?  Is that a big period of

21   time to conduct discovery?  Sure, but that's because it was

22   a long period of time that these employees were receiving

23   information that led them to stay in part potentially with

24   Liberty Mutual because they believed that in doing so, that

25   staying this period of time that they would be receiving a

1    certain benefit.

2         THE COURT:  Let me ask the question this way

3    because some of this may be semantics, some of this we

4    still contend there was an event that constitutes the

5    breach, but in order to prove it, we need to be able to

6    discover changes in things that were said prior to that to

7    put that all in context, so it may not matter all that

8    much, but if Judge Saylor were here and you guys were on

9    the eve of trial and Judge Saylor said, look, I need to

10   instruct the jury what the claim is or I need to instruct

11   the jury that on timing when the plaintiff says at the time

12   that defendants provided information to the plaintiff they

13   didn't intend to give the credit that they were talking

14   about, what year would you be invoking as representative of

15   that conduct?

16        MS. BALL:  I don't know that I have a great answer

17   for you right now because we haven't received all of this

18   discovery to see what was said and at what time, but it was

19   from the beginning, from the merger, there were discussions

20   that were given, there were plans that were communicated

21   that ended up not being consistent with what they actually

22   ever did.

23        I feel I'm not being very helpful to you and maybe

24   I'm not.

25        THE COURT:  Well, no, I understand what you are

1    saying.

2              MS. BALL:  Yes.

3              THE COURT:  But this is almost like a -- be a

4    great sort of law school exam for some sort of class

5    because what Judge Saylor has done has been to narrow the

6    scope of what the case is about, and because of that, I

7    think I have to be mindful, just like you guys have to be

8    mindful of ensuring that we're not ignoring that there may

9    be some things that have happened along the way that the

10   plaintiff is unhappy with that no longer matter for

11   purposes of what's before the Court.

12             So, essentially, broadly speaking, the ERISA, core

13   ERISA claims are no longer in play, and it's more of

14   a -- within that setting, was there unethical conduct?  Did

15   they misrepresent something where they had a duty to be

16   honest with me, did they say something dishonest?

17             That's in essence what we are left with, and I

18   think it's my job for discovery purposes to try to put some

19   parameters on that so we're not talking about an open-ended

20   thing where we are, where conceivably we could be talking

21   about any representative that was made in writing or orally

22   at any time, but at the same time, I'm saying I don't know

23   if I have to decide all of that because, as I said, a few

24   minutes ago, it could still be the case that for discovery

25   purposes, you should be entitled to collect information

1    over a multi-year period that could bear on whether at a

2    specific moment or a couple of key moments Liberty Mutual

3    breached a duty that it owed to Turner.

4            So that's what I'm saying, it may not matter in

5    the end, but I think at the same time in fairness to me and

6    in fairness to Liberty Mutual, especially where they raised

7    this and they say you're trying to kind of change this,

8    that's why I wanted to start out, and I'm not going to

9    dwell on this for this whole time, but I want to start out

10   by trying to get you to give me a sense from your

11   perspective of what the essence of this claim is.

12           At some point you would have to say the criminal

13   conduct or the unlawful conduct ended, it ended when

14   something happened, and I guess I was trying to get you to

15   focus, okay, tell me, when did it start and when did it

16   end?

17           On the when did it start part, I hear you to be

18   saying hard to say, they've said a number of things along

19   the way, so on that part, it's a little amorphous, but when

20   from my edification would you say for purposes of this

21   claim it was fully realized, that is, that the breach was

22   recognized when they now acted this way, which is to say

23   differently than what they had indicated to me before.

24           MS. BALL:  Sure.  If we're putting it that way, I

25   would say it ended when Mr. Turner made his claims for

1    benefits and was denied the cost sharing that he had been

2    told he would receive for a decade.

3            THE COURT:  Okay.

4            MS. BALL:  I know that's a long time, I know

5    that's a long period of time, but that's the point, that's

6    the wrong here is that they induced these employees to stay

7    for a decade because that's what they believed they needed

8    to do in order to be eligible for this cost sharing.  When

9    that decade was up, they didn't receive what they had been

10   told they'd receive that whole time, so I understand it's a

11   long period of time, and our instinct is to want to narrow,

12   but that's the point, that's the point of this.

13           THE COURT:  All right.  Let's start with that

14   then.  Why then, help me sort of fill it in, why do you

15   need years's worth of data when you, from where you sit,

16   can say, well, here's what Mr. Turner says they told him,

17   here are the representations they made to him as relations

18   to the cost-sharing contributions and we now know as of X

19   date he no longer was going to get the benefit of those

20   contributions, and I imagine we have that in writing, the

21   announcement, this benefit is no longer available to you,

22   so why do you need more and what more do you need?

23           MS. BALL:  Well, we need more for a couple of

24   reasons because Liberty Mutual is saying we didn't tell

25   Mr. Turner that.  That's not consistent.  We also need more

1    because this is still, I mean, class cert was denied, but

2    it was denied without prejudice.

3            This is still a punitive class action, so to have

4    that information that can go back to say the merger

5    agreement, which shows that it was an understanding of the

6    merger of these companies that they would receive this

7    benefit to show that this is treatment that they, too, not

8    Mr. Turner, that it was a whole punitive class of people.

9            THE COURT:  Let me stop you there because I want

10   to make this constructive even as we go along.  If we say,

11   all right, we go back to the merger and you get documents

12   relating to that, what sorts of documents because we could

13   imagine there's hundreds of thousands of pages relating to

14   a merger, a whole bunch, which would have absolutely

15   nothing to do with this case.  So when you say documents to

16   the merger, what exactly would you be referring to?

17           MS. BALL:  Yes, I can point you directly to

18   request for production we gave, it's Number 69, and it's,

19   as written, "All documents relating to the merger between

20   Liberty Mutual and Safeco, which describe or relate to the

21   treatment of years of service for purposes of determining

22   eligibility participation vesting, any form of benefit,

23   accrual or general benefits under any ERISA benefit plan,

24   including the retirement plan or health plan."  That is

25   targeted.

1        THE COURT:  That is targeted.  No, no, I should

2    have said this at the beginning, one of the things I like

3    to do in these, when you say something like that where I

4    think it might make sense to have you stop for a minute and

5    let me hear from Liberty Mutual, I'll ask them to comment,

6    and I'll come back to you.  I read that statement, I

7    listened to it.  That sounds reasonable to me on its face.

8        So, Liberty Mutual, let me ask you with respect to

9    RFP 69 where it does appear to be limited to documents that

10   would bear on what people might have been told about this

11   aspect of their benefits, do you object to that on

12   principal or would you say it's already been complied with

13   or we've given documents constructively to provide the same

14   information or what?

15       MR. LIAZOS:  A few things, your Honor.  First,

16   what has not been mentioned is that Liberty Mutual has

17   produced a pamphlet that was given generally to all Safeco

18   employees, which specifically addressed the cost sharing

19   issue and specifically said there would not be credit for

20   purposes of the Liberty Mutual plan and that Safeco

21   service, and that was recognized in Judge Saylor's summary

22   judgment motion to which we have asked for discovery from

23   Mr. Turner.  He just says he didn't get it but everybody

24   else did, so we provided documents relative to that issue.

25       THE COURT:  This is at the time of the merger?

1      MR. LIAZOS:  This is immediately after the signing

2   of the merger.

3      THE COURT:  Okay.

4      MR. LIAZOS:  Again, it's referenced in

5   Judge Saylor's earlier summary judgment opinion.  So

6   they're looking for a document that doesn't exist, and they

7   pointed to nothing in terms of misrepresentations other

8   than world misrepresentations.

9      THE COURT:  Well, before you get into that, I'm

10  not asking you to get into your whole argument now.

11     MR. LIAZOS:  Understood.

12     THE COURT:  I'm asking just a pretty focused

13  argument, which is it doesn't strike me unreasonable that

14  somebody in a case like this would say, hey, I'd like

15  documents that are around the time of the merger that may

16  have spoken to how this issue is going to be addressed, and

17  my question to you is if those exist, would there be a

18  problem with turning them over or would you say whatever

19  exists has been turned over or what?

20     MR. LIAZOS:  I would say, your Honor, that Liberty

21  Mutual has turned over documents relative to that matter,

22  but at this point it's not longer relevant.  Judge Saylor

23  has ruled on the plan document and the SPDs.  That count is

24  no longer live in this case, the only claim --

25     THE COURT:  Well, the (a)(3) claim basically says

you told me one thing and you did something else, so why
wouldn't it matter what they may have been told at the time
of the merger if the claim is that years later you acted in
a different manner?

MR. LIAZOS:  So if -- well, first of all, the
discovery request does not say that.  It doesn't comply
with the local rule, it is a broad-base ask, and indeed,
your Honor, the ask for additional discovery was only made
after March 15th, which was the last day of the scheduling
order in which time they've come up with a new theory for
the case, so discovery has been granted on these items.

We did ask before April 5th for specific items and
they said, well, we do have these specific items, but then
we've got a motion to compel that is just incredibly broad,
so it's hard for us to answer that with more specificity
other than to note to the Court and what was noted by
Judge Saylor that a pamphlet was given to all Safeco
employees generally which specifically addressed this
issue.

THE COURT:  I'm not sure I'm saying anything to
challenge that, I think what I'm saying though, the request
as framed doesn't strike me as patently unreasonable, and
one response could be we've already responded to this
satisfactorially, we've already given you things that we
think are proportional, and another could be we're not

1    going to give you anything at all, and I was just trying to

2    understand what Liberty Mutual was with respect to the

3    request as framed, that's all.

4         MR. LIAZOS:  The request as framed in this motion

5    to compel is exceedingly broad.  Discovery has been

6    provided with respect to this topic over a number of years,

7    and, you know, frankly, it's four plus years later, and now

8    they're changing their theory of the case and wanting to

9    broaden out these requests to try to introduce a new claim,

10   which Judge Saylor has noted, and that's Liberty Mutual's

11   position on that matter.

12        THE COURT:  Okay.  I'm still not sure you've

13   answered my question, which was a request to know what

14   was -- what was said to people around the time of the

15   merger, so documents that would bear on that, whether that

16   strikes you as a reasonable request in the context of a

17   claim like this or unreasonable such that you would be

18   posting an objection.  I do understand that you've said

19   there was a pamphlet that everybody got, and I do

20   understand there's been litigation surrounding other parts

21   of this case that, you know, and that maybe you have a

22   right that they're still waiting to define really what the

23   scope of this claim is, I was just kind of trying to get an

24   idea is there something to fight over here?

25             Are there still documents out there that were

1    generated around the time of the merger leading up to the

2    merger speaking to this issue of contributions, cautionary,

3    and contributions that might have helped one to understand

4    what Liberty Mutual was conveying to people around the time

5    and, again, in a vacuum, it doesn't strike me as that

6    unreasonable of a request.

7         MR. LIAZOS:  I understand, your Honor, and I

8    understand in a vacuum how one could see how that could

9    relate to a fraud claim that was a misrepresentation.

10        To be perfectly candid, your Honor, I'm a last

11   minute substitute here.  I've been following this case for

12   four years, and I'm not going to make a representation as

13   to the scope of exactly what was given, so I need to go and

14   look back in fairness, your Honor, but what I can tell you

15   very specifically is that what was filed for the motion to

16   compel, I mean, it's just unfair for us to answer that

17   question given how exceedingly broad it was and how it did

18   relate to a prior discovery request.

19        Now, for the first time, your Honor, Ms. Ball is

20   saying, okay it relates to this request for production.

21   Well, that wasn't in the motion, it wasn't saying how we

22   didn't comply, so I'm a little -- it's a little difficult

23   to answer that.

24        THE COURT:  What I try to do in a situation like

25   these is have everybody roll up their sleeves and let's

1    just work through these because in some of this, as I was

2    reading through, Ms. Ball, it was hard for me to agree that

3    you should be entitled to everything that you were looking

4    for, but there were some parts of it where I said, okay, if

5    it's the only claim that's left is this breach of fiduciary

6    duty claim, let's try to focus on that and let's try to

7    understand what the claim is and let's try to figure out

8    whether the meaningful discovery on this has been produced

9    or whether there are still some corners we can look into,

10   and that's what I'm trying to do.

11          Now, and I'm trying to sort of over the course of

12   an hour to go through these with you guys to see if we can

13   get some consensus.  After that, I think you guys are going

14   to have to hope we do our best looking at the papers to

15   make our own judgment calls.  We think it's always better

16   if we can do it with the papers, so that's why, Mr. Liazos,

17   I was sort of pressing you on this.  I'm trying to be

18   transparent.

19          If what we've got is basically a misrepresentation

20   claim that played out in slow motion over the course of a

21   number of years, documents, things that might have been

22   said at the beginning I do think probably on paper are

23   germane.  I'll tell you where I have an issue, Ms. Ball, is

24   saying over the years pretty much anything and everything

25   that may have happened in the company we need to be able to

look at.  That I have a hard time endorsing.

I also worry about this proportionality in terms of requiring Liberty Mutual just to go through years of records just to see if there might be something bearing on this.  It's really what may have been said at a key moment in the past versus then when it came time for Mr. Turner to realize the benefits of the plan and then to learn what shortcomings there were, those are the moments, and, as I understand it, you probably already have stuff at the latter end.  You probably understand, right, so we're really focusing more at the beginning end.

I'd look at RFP 69, and I'd say, okay, I might be inclined to endorse something like that, but I'd be limiting it to things for a finite time period, so I want to bog it down, but, Ms. Ball, let me go back to you and let's really try to go through this.

You tell me something specific that you're looking for, sort of a categorical fashion, and let's deal with it, all right?

MS. BALL:  Sure.  I'm going to go back to the first time we were here with you.  We were asking about attorney-client communications that hadn't appeared.  There was no indication of them on the privilege log prior to 2019.

When we talked then, your concern, which I

1  understand was that there wasn't enough specificity about

2  what those things might be.  Following that meet and

3  confer, we did a deposition of Liberty Mutual's 30(b)(6),

4  and in that deposition, we asked questions about changes,

5  modifications, clarifications that take place on the SPDs,

6  how those work, and she confirmed to us at that time that

7  any time there's sort of clarification made for clarity or

8  amendments, changes, modifications, they're discussed in a

9  committee, then they are sent to in-house counsel, and

10  those are reviewed.

11        Basically what we got at that time was

12  clarification, yeah, any time, any time something like this

13  happens, it's reviewed by an attorney.

14        THE COURT:  Uh-hum.

15        MS. BALL:  I think based on your prior ruling

16  then, those are the clarifications made for the benefits of

17  the beneficiaries.  That's not protected by the

18  attorney-client privilege.  I understand, again, this is a

19  long period of time we're talking about, but if there were

20  clarifications made to the language related to the Safeco

21  employees and cost sharing over the course of time, that's

22  what we're looking for, communications and documents

23  related to -- any communications with the attorneys based

24  on those things.  Is that clear?

25        THE COURT:  I guess I don't -- the attorney aspect

1    of it -- I guess I don't understand conceptually why they

2    would have -- why an attorney being involved would make

3    them more or less discoverable, that really only to the

4    extent we have an issue about whether they're privileged

5    and shielded from disclosure, but it seems to me really

6    what you would want, put aside who was involved in the

7    chain would be decision-making by Liberty Mutual bearing on

8    changes to this benefit, this really small component, no

9    matter who was involved, and then the question would be one

10   of proportionality.

11        If we're talking about a several-year period, I

12   don't know why we would want to -- I don't know whether it

13   would be fair to force Liberty Mutual to go through years

14   and years and years of records to find communications that

15   may have been somewhat innocuous but talked about this

16   benefit when you have what Mr. Turner was told and then you

17   have at the other end what they said at the end when they

18   said no, you're not getting this benefit.

19        It may be helpful for you to understand how they

20   got to that point.  I don't know how critical it is for

21   proving your claim, and, again, the concern is not so much

22   one of relevance but a little bit of relevance, but it's

23   about proportionality.

24        I think the burden here on Liberty Mutual -- I

25   have no idea how the records are kept, I have no idea how

1    one would go about searching this stuff.  We're talking

2    about a big company over a several year period.  Many

3    people could have been involved in those sorts of

4    communications, and I just don't know that it would be fair

5    to force them to do that sort of search, again, for records

6    where it's not clear to me that they're going to be that

7    germane in this lawsuit.

8         MS. BALL:  Well, your order on the previous motion

9    to compel sort of shed some light on why this is important.

10   You said in that one, "Internal communications about the

11   details and scope of the benefits are relevant insofar as

12   they may demonstrate that the defendant's understanding of

13   the then existing benefits was consistent or inconsistent

14   with what they communicated to the plaintiff."

15        THE COURT:  Yes, sure, but as creatures of common

16   sense, we can put some real reasonable strict time limits

17   on this where I can say let's focus on the year or two

18   around the merger when this would have been a hot topic,

19   and then let's focus on the year or two leading up to

20   Mr. Turner's retirement where we all know he was making a

21   lot of noise about wanting to know about the details, and

22   it's my sense from the prior hearing we had, there was a

23   general understanding that he prompted Liberty Mutual to

24   kind of go back and look at some of this stuff.

25            I don't know that you've made the case for several

1    years between, so say circa 2010/11 to in 2017, I don't

2    know what we might see in there that's really going to be

3    that critical or helpful.

4         MS. BALL:  There were specific years where there

5    were bigger changes made to the language in the policy.  I

6    don't know what those years are right now, but maybe what I

7    would suggest then maybe we can narrow the scope of this

8    request by saying these years, can you look for these

9    documents for these specific years?

10        THE COURT:  Well, what years, that's the question,

11    but as part of that I guess I'd also want to know, do you

12    already have other stuff that kind of helps you understand

13    this, so, for example, my understanding is you've got all

14    the summary plans for each year.  Those plans, correct me

15    if I'm wrong, would speak to the contours of this

16    component, of this cost-sharing benefit.

17        If you've got that for the years, it really

18    represents I guess that the results of any internal

19    communications about what we should do, how we should

20    behave because if it all gets reflected in an SPD and you

21    got the SPD, why should you be getting anything more?

22        MS. BALL:  Because, as Ms. McDermott explained to

23    us, any sort of changes are made in response to plan

24    beneficiaries inquiries when they sort of start to see like

25    negatives, some confusion here, so what we're looking for

in these years that the changes were made was it because they knew that there were Safeco employees in their eyes were misunderstanding, in your eyes were perfectly understanding but then they adjusted the language to change what it allowed.

So she said like, for example, and I think we have this maybe for one of the later SPDs, they red lined the documents, they make notes in the margins to talk about maybe why they should be changing this stuff.

Getting that for the years where there were significant adjustments may shed light what defendant's understanding was of what Mr. Turner and these other Safeco beneficiaries understanding was the plan.

THE COURT: What were the years where there were significant adjustments?

MS. BALL: Your Honor, I don't want to speak out of turn here. I don't know for certain. I believe there was a pretty significant change in 2014, but I just don't know what the other years were. It wasn't -- I'm not going to come back and say, okay, I narrowed it down between 2008 and 2018, it's all years except for 2016, it's not that. There may be three or four years that would be particularly relevant.

THE COURT: Well, I don't know, I think I have to go back and reflect because obviously if there was

1    something out there, I'm making stuff up, there was a true

2    really pertinent piece of communication where you've got

3    people saying oh, my God, this is going to really affect

4    our bottom line if we continue to provide this benefit, we

5    need to change this, and even though we've told people

6    differently this is how we're going to do it.

7    Everyone can imagine why that would be something

8    you might want that you would be entitled to, but if, on

9    the other hand, you have a situation where the plaintiff

10    has no idea what communications may be out there and just

11    says I'd like to see, I want to go fishing, who knows what

12    I'm going to find, we could agree, no, that's not what

13    discovery is about, that's not proportional, that's

14    probably unduly burdensome.

15    I don't know where this one falls, but I have

16    concerns that it falls closer to that than it does of

17    plaintiff having a basis to really fear there's likely to

18    be something that's very germane there, and it doesn't help

19    your argument to understand you've already been provided

20    with the plans themselves throughout the years so you can

21    sit there and actually chart just by comparing them what

22    changes were made and where I've already signaled, I'll go

23    back and look at RFP 69, and probably to the extent Liberty

24    Mutual hasn't already done so where I'm likely to say if

25    there are communications that were made around the time of

1    the merger that reflects the thinking that went into the

2    first plan or the plan that would have been provided around

3    that time to provide that subject, of course, to privilege

4    or anything like that.

5        And if you already acknowledged you got discovery

6    that bears on what happened in the end with Mr. Turner

7    ultimately retired, I don't know that in the context of

8    this case given the claim you've got that it would be

9    warranted to force Liberty Mutual to do too much more, but

10   I will continue to reflect on that.

11       And as far as again, as far as the lawyer

12   communications, the letters and everything go, I don't

13   think it's so much that it's lawyer, you know,

14   communications between lawyers that's really the issue or

15   lawyers were involved, it's more the subject matter whether

16   as it relates to your misrepresentation claim

17   communications that might bear on that, and then if the

18   lawyers were involved and there were any issues of

19   privilege that we need to talk about or litigate, we could

20   do it that way.

21       Maybe what makes sense, unless Liberty Mutual

22   wants to be heard on this some more, we just go back on our

23   end now and try to strike a balance.

24       MR. LIAZOS:  So, your Honor, respectfully we would

25   like to be heard on this issue.  I would like to go back to

your prior question because I've had a chance to confer

with my colleague, Mr. Diggs, and just go through the back

and forth emails with plaintiff's counsel, I think a little

perspective here in terms of what happened after March 15th

will be helpful at least from the Liberty Mutual

perspective kind of understand what's really going on here.

You know, it's been long known that the last day

of discovery was March 15th, and after a second deposition

of our 30(b)(6) witness, who is the head of Liberty Mutual

entire benefits group, we then hear over a week later, that

oh, we think we need to get into new matters, and then we

had a conference with Judge Saylor on the 28th of

March where he listened to this and said, okay, you guys

work it out, I'm paraphrasing it, figure it out, file a

joint statement and figure out where to go, and so at that

point in time there was back and forth on RFPs.

Now, none of this, of course, is in any of the

motion to compel that was filed by plaintiff.  What's filed

by plaintiff in that May 1st motion to compel bears no

resemblance to any communications with Liberty Mutual

before that joint entertainment was filed, and so I'm going

to read from a letter that was written to plaintiff's

counsel after that joint filing with respect to specific

requests for production of documents, not this May 1st

filing that is just broad beyond any conception.

1        So Request Number 69, "All documents related to

2    the merger between Liberty Mutual Company and Safeco which

3    provide or relate to treatment, years of service for

4    purposes of eligibility, participation, vesting of any form

5    of benefit accrual or general benefits under the ERISA

6    benefit plan, including the retirement plan or health

7    plan."

8        Response:  "Liberty Mutual has already provided

9    documents responsive to this request as part of an earlier

10   discovery subject to Liberty Mutual's supplemental

11   responses and objections to plaintiff's request for the

12   production of documents dated October 19th, 2023 because

13   Liberty Mutual has already provided documents in response

14   to this RFP that are properly within the scope of discovery

15   following the court's prior summary judgment rulings and

16   because discovery is now closed, Liberty will not produce

17   those documents."

18       Now, again, this particular matter, again, is not

19   raised in the May 1st motion to compel, and we would

20   submit, your Honor, that this motion to compel is directly

21   related to the class action certification.  They introduced

22   an entirely new claim that wasn't in the complaint.  In

23   that regard, it's not a coincidence that they filed their

24   motion to compel on the same day that they filed class

25   action certification, and so all of these matters to which

we had some back and forth with after the March 28th

meeting with Judge Saylor, none of that is in the motion to

compel.

THE COURT:  All right.  I guess I just want to

make sure I understand this.  None of what Ms. Bell and I

have been talking about is in the motion to compel?  RFP 69

is not invoked in the motion to compel?

MR. LIAZOS:  I'm saying that what the local rules

requires, as you well know, your Honor, is really to get

that specific discovery requests.  The correspondence back

and forth between the plaintiffs and defense counsel

focused on the specific RFP.

THE COURT:  Right.

MR. LIAZOS:  Now we get a motion to compel, we're

here now sitting --

THE COURT:  You're saying that was not raised with

you as a subject of disagreement where it might be reduced

to a motion to compel?

MR. LIAZOS:  The motion to compel was a shock to

us when we saw the scope of it, the fact that we had back

and forth regarding specific RFPs and we gave responses on

many different RFPs.

THE COURT:  So I'm not here to challenge that.  I

think I could probably tweak both sides when it comes to

that, but we routinely in the motions we get often the

1    complaint from an opposing party that this wasn't really

2    raised with them in a way that they simply understood, and

3    I'm sympathetic to that, and that can be an issue in large

4    part because sometimes they would say, gee, had we known

5    this, we could have really made this a nonissue because

6    either we've already provided this information or we could

7    explain to you why we don't think it's relevant, we could

8    have worked something out.

9         We're here now and I'm just trying to be really

10   constructive and try to make this as much as a nonissue as

11   I can.  When you were telling me your response though,

12   Mr. Liazos, to RFP 69, I'd like you to go back and read

13   that again.  There was one part that seemed to be saying --

14        MR. DIGGS:  Sure.

15        THE COURT:  There was one part where you seemed to

16   be saying we've already responded, we've already given you

17   stuff, but then it kind of ended with, and then for these

18   reasons, I'm not going to give you anything.

19        So I guess I'm still trying to understand on this

20   what, when Liberty Mutual responded and Liberty Mutual

21   produced materials in response to this request to the

22   extent, you know, what spiritually was it seeking to

23   provide?  You may, say yeah, we weren't going through all

24   the depth as the way it's framed, but here's what we

25   provided.  You talked about a pamphlet at the beginning,

1   but I'd like to think maybe there was more than a pamphlet

2   that was given.

3            MR. LIAZOS:  Your Honor, there were documents,

4   certainly, for example, the plan document.  We also

5   provided, which isn't really directly relevant, we provided

6   the retirement plan document because plaintiffs believed

7   that something in that pension plan that was drafted

8   related to this particular matter, so I can't give you all

9   the documents off the top of my head, but we did provide

10  documents, and I just wanted to have it in the record that

11  this was the response given to plaintiff's counsel on

12  April 12th.

13           Instead of filing a motion to address this and

14  have a constructive conversation today, we just have this,

15  need everything, and the other point I wanted to make very,

16  very quickly is this whole attorney-client issue, we really

17  don't understand because the only claim that's left in the

18  case is the (a)(3) claim.  So how is it that when we're

19  thinking about, when Liberty Mutual is considering changes

20  to a plan that that is going to be relevant when nothing is

21  being communicated?

22           THE COURT:  Well, as I just indicated, right, I

23  sort of agree with you on that.  I don't really think that

24  was the issue, what you said to me is the issue whether

25  there's relevant information that is out there.  If it

1  turns out that a lawyer is involved on the distribution

2  list or in sending it, then maybe it creates an issue that

3  we need to talk through of privilege, but that's really

4  more of a side issue, and it's only if in the course of

5  coming up with discoverable information, we see a lawyer

6  was involved may have, so I really don't think that was the

7  issue.

8       But, again, when you responded, when Liberty

9  Mutual responded to RFP 69, did it say in its response we

10  refer you to documents, Bates stamped numbered X through X

11  so that we all can see for prosperity what was given in

12  response to this request?

13       MR. LIAZOS:  I will look for that information.  I

14  do not know that answer off the top of my head.

15       THE COURT:  Ms. Bell is shaking her head no, and

16  what I'm trying to get at there, again, what I would be

17  inclined to do to deal with this whole subject matter would

18  be to say information around the time of the merger that

19  would reflect conversations regarding this particular

20  component that's left, the contribution sharing piece, I

21  think if it can be rooted out without a Herculean effort is

22  discoverable.

23       I'm not inclined to then say that the medieval

24  period from post merger to retirement is one where Liberty

25  Mutual I'm going to force them now to go through that,

1   although common sense tells us if there really was a

2   particular significant event where everybody kind of agrees

3   there was a conference regarding how to address this

4   component or something, that would be different, but in the

5   absence of people knowing of any of this, particularly at

6   this juncture, I don't think in light of the claim, as I

7   understand it, I would impose that requirement, and then,

8   and again, the RFPs have already been provided, so it

9   allows one to go through at moments just to see how

10  particular aspects of the plan were being articulated and,

11  then we've got discovery that I understand through the

12  plaintiff was provided around, reflecting the time period

13  that Mr. Turner when he left Liberty Mutual.

14          So that's how I'm likely to deal with that, and it

15  would thus include, that would include if there were

16  communications, internal communications where lawyers

17  happened to be on it, and then if we have to deal with that

18  issue, we deal with that issue.

19          Again, to me the issue is the content here rather

20  than who was involved, so that's how I'm likely to deal

21  with that, all right?

22          Given that, Ms. Bell, what else in our time would

23  you like to talk about?

24          MS. BALL:  Well, you know, part of the reason why

25  we end up in this situation because Liberty has sort of

1    limited our discovery over and over again, only 2019, only

2    this, only this, that's why we're still here, that's why

3    we're still doing this in 2024 when the case was filed in

4    2020.

5          The other issue is the vast majority of their

6    discovery responses don't make clear whether they've

7    produced all documents or not, they sort of cherry pick,

8    they answer on the merger document, hey, we gave you this

9    pamphlet.  Cool, but what we don't know is are there other

10    things, too?  So I mean if it's a matter of them saying,

11    listen, we've already given all this stuff, okay, then

12    supplement your responses and let us know that so we can

13    stop arguing about this.

14          THE COURT:  Yeah, I mean, I think what I would try

15    to do to make this easiest for people is we would go

16    through and we would issue some broad rulings on this, for

17    example, I'll go back and I'll look at RFP 69.  I'll tell

18    you the way it read, it needs to be trimmed.

19          MS. BALL:  Sure.

20          THE COURT:  But I would then say all, you know,

21    bearing on that, so to the extent that Liberty Mutual would

22    need to supplement and would need do supplement its

23    response to indicate whether there is anything additional

24    or not anything additional to offer, they should do that.

25    We can do that on our end with a little bit of

1    wordsmithing, so I get that, but substantively, Ms. Bell,

2    with respect to things, discovery that you are looking for,

3    is there -- are there other things that you want to raise

4    beyond what we've just talked about?

5           MS. BALL:  Your Honor, I understand your Honor's

6    concerns about the scope, and I don't want to bemoan the

7    issue too much, but I would just say the issue in this case

8    is about representations made to these retirees over the

9    course of a decade, what Liberty Mutual understood that

10   they believed and what they did in summons to that, so

11   changes made over the course and their consideration of

12   those changes are relevant to whether there were

13   misrepresentations, whether they knew that there was a

14   misunderstanding, if that's what it was, and what they did

15   in response to that.

16          Is it a long period of time?  It is, but it's a

17   long period of time under the plaintiff's allegations that

18   they were misled about what happened.

19          THE COURT:  I think the way I respond to that is

20   to say I don't have to decide today whether I agree or

21   disagree with that characterization of the scope of the

22   claim.  That would be for Judge Saylor.

23          MS. BALL:  Yes.

24          THE COURT:  For discovery purposes, I do tend to

25   be -- I do tend to take a more liberal broader approach, so

1   to the extent it's arguable, I would tend to support a

2   plaintiff's characterization of a more liberal read of the

3   claim, but even then for proportionality concerns come into

4   play, and I would be very concerned about whether it would

5   be disproportionate to require Liberty Mutual to do more

6   for that middle period where we don't necessarily know of

7   anything specific, where the complaint doesn't explicitly

8   carve out that period as being a time, where

9   representations were made, and where everybody disagrees

10  about the plans themselves for all those years, whatever

11  plans were produced or provided have been proposed, so to

12  an extent the inquiry that you would want to make is

13  probably one that you can already begin to make.

14          Now, I'm not you encouraging you to do this, but

15  I'm just musing because I think we are now too far down the

16  road, but I'm musing.  It might have been a different

17  scenario if what you had done was to say I have examined

18  all of the STPs and I have charted changes along the way

19  that appear to show that Liberty Mutual understood it would

20  not have been advantageous or it would be too expensive to

21  honor this benefit, and, therefore, appears to signal

22  deliberate changes over the years culminating in what

23  happened and what was issued around the time of

24  Mr. Turner's retirement, but we don't have that on this

25  record, and, therefore, I don't think I can endorse what

1    you are asking me to endorse absent something more

2    definitive and concrete like that.

3            So, again, I want to be fair to both sides.  I

4    also do understand this is the claim that is left.  I want

5    to avoid a situation, same for Liberty Mutual's edification

6    as well, I want to avoid a situation where at the end of

7    this whole process you guys find yourself in front of

8    Judge Saylor maybe thinking about additional litigation,

9    like a trial, and it comes to pass that there really is

10   critical information that should have been discovered but

11   Cabell was just acting too conservatively and didn't permit

12   it to happen, that's why there is a part of me that finds

13   it defensible to try to indulge to a degree some of what

14   the plaintiff is seeking but that, Ms. Bell, I'm telling

15   you I'm trying to find that mid-point in light of the prior

16   litigation and knowing that this case really has been

17   trimmed severely and knowing at the moment it is not a

18   class action case, it is just a case involving Mr. Turner.

19           MS. BALL:  I'll say this one final thing unless

20   you have other questions.  It's a long period of time but

21   it's 10 SPDs and not all of those 10 even made changes to

22   the Safeco benefits.  That already significantly limits

23   what they would be looking for.  It's maybe four SPDs that

24   they would have to look and see, do we have notes on these

25   changes, communications regarding clarifications that were

made on them.  It's a long period of time.  I don't think
it's that many documents that they would need to look
through.

THE COURT:  I will reflect on it.  I will reflect.
I will look, all right.  I guess I'm curious whether
there's been any other discovery that would have asked
Liberty Mutual to share internal thinking on this component
other than what you're now asking the Court to do.  That is
through depositions, for example, through requests for
admission, through other interrogatories, has this been
explored?

MS. BALL:  Yes.  I think it's probably been
explored to death.

THE COURT:  Okay.

MS. BALL:  But if you want a specific, and part of
the reason I keep bringing up the attorney-client privilege
issue that is already a part of their objections to these,
so I get sensitive about that and relate back to it, but if
you want specific requests, Interrogatory Number 18 and RFP
Number 74, which are the two most recently produced
requests are directly on this issue.  And those were, they
were exhibits to our motion.

THE COURT:  And I'm not sure how that cuts.
There's an argument that cuts for you, there's an argument
that cuts against you.

1          MS. BALL:  Sure.

2          THE COURT:  Because you had opportunities, and you

3     had, in fact, explored it, as you say, to death.  There's a

4     question as to -- and, again, it would be different if all

5     of a sudden it was like, hey, you just learned there was a

6     multi-year period where there may have been discussions and

7     we know nothing about them, but that's not the case here.

8     You have known about them and you asked about them, you

9     know, through other interrogatories and requests for

10    documents, so, again --

11         MS. BALL:  And defendant has refused to produce

12    the information over and over and over again, which is why

13    we're here again.  We touched on it a little bit in our

14    previous motion to compel.  We've gotten more information

15    to sort of confirm that these discussions took place so we

16    could be a little more specific about information we don't

17    have, and, so, yes, when I've said we've done it to death,

18    we've asked a thousand times.  For years, we weren't

19    allowed to ask for anything before 2019 now we're here and

20    we've been fighting about it since the scope of discovery

21    opened up late last year.

22         THE COURT:  I understand the point you're raising,

23    but, again, I think this is really an issue of

24    proportionality, and you say it might only be three or four

25    years, but, nonetheless, for any year if one has to do a

search like, I mean, I don't know how you go about doing

it, but I can imagine it's not as simple as pressing a

button or putting some search terms into a single database,

so I need to give some thought to that, right?

Mr. Liazos, I can't tell whether you've been

chafing at the bit to say something or you're just sitting

there.

MR. LIAZOS:  I'm trying to be respectful and

listen.  I understand the angst you have.  You certainly

don't want to have a situation where there should have been

production and later on there's a problem.

THE COURT:  Right.

MR. LIAZOS:  And, you know, if we were in 2022 or

2023, I would have a lot more understanding of where you're

at.  This isn't a new claim that they've added.  This claim

has been there since the beginning of the case, and your

Honor --

THE COURT:  I'll tell you here's my worst concern.

I appreciate your words.  Let me just tell you my worst

nightmare, Mr. Liazos.  Case proceeds further down the

path.  At a certain point, you're in front of Judge Saylor

on something, and then it comes to light Liberty Mutual

says, well, there was that time in 2015 when we all got

together and said we really need to change this plan, boy,

the participants aren't going to like it, but we'll save a

1    lot of money if we eliminate our obligation to make

2    contributions, and then you say, well, Cabell did not make

3    us, he did not force us to do a search that would have

4    captioned communications like that.  That would be my worst

5    nightmare because technically you would be right but

6    spiritually you couldn't be more wrong.

7         My reason for not requiring Liberty Mutual to do

8    it in the year 2024, yeah, it's partly for the reasons you

9    say, but it's partly because it seems to me that the

10   plaintiff has already been provided with some information

11   over those years.  Plaintiff is likely to get you to maybe

12   have you provide a more fulsome response for the time

13   around the merger.  Plaintiff has already been given stuff

14   for about around the time Mr. Turner retired, and so at

15   this juncture it doesn't seem warranted to force Liberty

16   Mutual to do more.

17        But that doesn't mean Liberty Mutual should not

18   independently reduce discovery bearing on this if it knows

19   of it during this time period and knows that it might tend

20   to help somebody to understand the evolution of their

21   thinking as to how to treat this particular benefit, okay?

22        MR. LIAZOS:  Understood, your Honor, I would just

23   say that frankly we've had many communications over

24   discovery, over very specific items, and I think it would

25   be appropriate to give context to this Court the back and

1   forth communications between plaintiffs and defendants by

2   very specific narrow issues and have a constructive dial-in

3   on this and, frankly, the motion to compel just bears zero

4   relationship to that, and so our frustration, your Honor,

5   is we're sitting here four years after litigation, hundreds

6   of thousands of dollars have been spent on discovery, and

7   the idea of having to go back and do more discovery with a

8   claim that's been there from the beginning, frankly, your

9   Honor, our read of it is very clear.

10          They basically tried to put another claim in for

11  cross-action certification, couldn't get it done, and now

12  this is another fishing expedition to try to find out

13  something else because the only claim that's left in the

14  case has to do with representations, and there's not any

15  representations they pointed to nowhere that shows that a

16  representation was made to a broad group of people, and

17  we've already provided 80 recordings of calls Mr. Turner

18  made to the call center, so that's the frustration, your

19  Honor.

20          THE COURT:  Understood.  Understood.  I appreciate

21  from both sides where people are coming from, and if there

22  was a way I could so surgically and so clearly craft

23  something that basically said something that really bears

24  on Mr. Turner or conversations about benefits that would

25  impact him given his status as a former Safeco person who

1    then came at the time he became retired, at the time he

2    retired such that we really could just in a micro sort of

3    way focus on limited types of communications that could

4    bear benefit to him, I would do that, but I don't think I

5    could do that.  I don't think it's possible to do that,

6    and, again, I'm not going to go back and now reopen all of

7    this up, and that's where I'm just trying to listen to both

8    sides, and I think we can come up with something that

9    strikes a balance, all right?

10            MR. LIAZOS:  Let me represent to the Court, this

11   much I can tell you, I've been Liberty Mutual's counsel for

12   over 20 years, and I'm familiar with their benefit plans.

13   I mean, we produced everything that goes to the evolution

14   of the thought process when it comes to this.  If a

15   representation needs to be done along those lines, we

16   certainly can provide it.

17            THE COURT:  I appreciate that, and I think it

18   wouldn't be a bad idea to include that in any supplemental

19   response you might want to provide to counsel for the

20   plaintiff in that, but I appreciate hearing it from you in

21   the context of this motion.

22            MR. LIAZOS:  (Indiscernible) after the March 28th

23   conference with Judge Saylor because plaintiff made

24   reference to the proposed, you know, the proposal on

25   April 5th, but there's no discussion of that anywhere, and

1  I think it would be very helpful to the Court to see the

2  back and forth of what Liberty Mutual was willing to do and

3  what plaintiffs decided to do in response to just

4  completely ignore it and open up the scope of discovery to

5  support a claim frankly that Judge Saylor said does not, is

6  not appropriate.

7  THE COURT:  All right.  Thank you.  So just so you

8  guys know what to expect to see, I don't think this is the

9  sort of issue that lends itself well to like a

10  30-page opinion talking about the fundamentals of discovery

11  and the like, so what I'm likely to do when we go back and

12  digest this, we're going to come up with something that

13  will basically say there's this motion to compel that's

14  pending, it's been fully briefed, we had a hearing on X

15  date, and based on arguments that were raised in the

16  parties paper, based on the information that was adduced at

17  the hearing, the Court rules as follows, and, you know,

18  thus will be the rulings without a whole lot of

19  explanation.

20  So I just want you to be, you know, to understand

21  that's how I'm likely to treat this because I want to deal

22  with this sooner rather than later, and I don't want to

23  have to spend a lot of time doing stuff and writing things

24  that you guys already understand, okay?

25  Let me ask you assuming this issue gets resolved,

1    are we done with discovery, and then what's the next major

2    event in this case?

3              MS. BALL:  Motions for summary judgment.

4              THE COURT:  I want to be clear, it's really -- tee

5    it back up for dispositive motions and thing like that.

6    All right.  All the more we will try to deal with this

7    sooner rather than later, all right?  Thank you, everybody.

8    This has been very helpful.

9              MS. BALL:  Thank you so much for your time.

10             MR. LIAZOS:  All right.  We'll be in recess.

11             (Whereupon, the hearing was adjourned at 2:53 p.m.)

12                   C E R T I F I C A T E

13   UNITED STATES DISTRICT COURT )

14   DISTRICT OF MASSACHUSETTS ) ss.

15   CITY OF BOSTON )

16             I do hereby certify that the foregoing transcript,

17   Pages 1 through 45 inclusive, was recorded by me

18   stenographically at the time and place aforesaid in Civil

19   Action No. 20-11530-FDS, THOMAS TURNER, et al. vs. LIBERTY

20   MUTUAL RETIREMENT BENEFIT PLAN, et al., and thereafter by me

21   reduced to typewriting and is a true and accurate record of the

22   proceedings.

23             Dated November 7, 2024.

24                   s/s Valerie A. O'Hara
                     _____
25                   VALERIE A. O'HARA
                     OFFICIAL COURT REPORTER